UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾x

KIMBERLY DEPUY,

         Plaintiff,

  -against-

OFFIT KURMAN, P.A., AARON BUKOWITZ,
ROBERT SKINNER, and KARLA STATES,

         Defendants.

‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾x

Civil Action No.: 1:23-cv-10961

**AMENDED COMPLAINT**

*Jury Trial Demanded*

PLAINTIFF KIMBERLEE DEPUY, by and through her attorneys Goddard Law PLLC, whose offices are located at 39 Broadway, Suite 1540, New York, New York 10006, alleges upon knowledge with respect to herself, and upon information and belief as to all other matters, as follows:

## PRELIMINARY STATEMENT

1.  This is a civil action brought on behalf of Plaintiff Kimberlee DePuy ("Plaintiff") against Defendant Offit Kurman, P.A. ("Defendant Offit Kurman"), Defendant Aaron Bukowitz ("Defendant Bukowitz"), Defendant Robert Skinner ("Defendant Skinner"), and Defendant Karla States ("Defendant States"), collectively "the Defendants," for unequal pay in violation of the Fair Labor Standards Act ("FLSA") 29 U.S.C. §§ 206(d) *et seq. as amended*, (the "Equal Pay Act") and the New York State Equal Pay Act, N.Y. Labor Law § 194 ("NYEPA"), gender/sex and disability discrimination, hostile work environment, and retaliation in violation of the New York State Human Rights Law, N.Y. Exec. Law 290 *et seq.* ("NYSHRL") and the New York City

Human Rights Law, N.Y. Admin Code 8-101 *et seq*. ("NYCHRL"), together with any and all other causes of action which can be reasonably inferred from the facts as set forth below.[1]

2.      Defendant Offit Kurman creates and encourages a male-dominated atmosphere wherein female employees are regularly subjected to sexual harassment, a sexually hostile work environment, and verbal abuse because they are women. Defendant Offit Kurman encourages this behavior by failing to correct the behavior of its male employees, even when numerous female employees have reported discrimination acts. To further encourage the discrimination, Defendant Offit Kurman retaliates against any female employees who complains of discrimination.

## **PARTIES**

3.      Plaintiff Kimberlee DePuy ("Plaintiff") is a female citizen of the United States who resides in Manhattan, New York.

4.      As a woman, she is a member of a protected class within the meaning of all relevant Federal, State and local laws including, but not limited to the New York State Human Rights Law and the New York City Human Rights Law.

5.      At all relevant times herein, upon information and belief, Offit Kurman, P.A. ("Defendant Offit Kurman") is corporation licensed and registered to do business under the laws of the State of New York, with more than 15 employees.

6.      Upon information and belief, Defendant Offit Kurman's national headquarters is located at 300 E. Lombard Steet, Ste. #2010, Baltimore, Maryland 21202.

---

[1] Plaintiff plans to amend her complaint to include Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq*., and The Americans With Disabilities Act, 42 U.S.C. § 12101, *et seq*. upon receiving the Notice of Right to Sue for her charge currently pending at the EEOC.

7.      At all relevant times herein, Plaintiff was an "employee" of Defendant Offit Kurman. Plaintiff worked at Defendant Offit Kurman's Virginia office and then transferred to Defendant's New York City office located at 590 Madison Avenue, New York, New York 10022.

8.      Defendant Offit Kurman is and was, at all times relevant herein, Plaintiff's "employer" within the meaning of all relevant federal, State, and local law including, but not limited to, the Equal Pay Act, the New York Equal Pay Act, the New York State Human Rights Law, and the New York City Human Rights Law.

9.      Defendant Aaron Bukowitz ("Defendant Bukowitz") is and was, at all relevant times, the Chief Operating Officer ("COO") for Defendant Offit Kurman and Plaintiff's direct supervisor. As the CEO and Plaintiff's supervisor, Defendant Bukowitz had the authority to hire, fire, or affect the terms and conditions of Plaintiff's employment, or to otherwise influence the decisionmaker of the same and was Plaintiff's "employer" under all relevant laws.

10.     Defendant Robert Skinner ("Defendant Skinner") is and was, at all relevant times, the Chief Administrative Officer ("CAO"), for Defendant Offit Kurman. As the CAO, Defendant Skinner had the authority to hire, fire, or affect the terms and conditions of Plaintiff's employment, or to otherwise influence the decisionmaker of the same and was Plaintiff's "employer" under all relevant laws.

11.     Defendant Karla States ("Defendant States") is and was, at all relevant times, the Director of Human Resources ("HR") for Defendant Offit Kurman. As the Director of HR, Defendant States had the authority to hire, fire, or affect the terms and conditions of Plaintiff's employment, or to otherwise influence the decisionmaker of the same.

## FACTUAL BACKGROUND

### Plaintiff Suffers From Generalized Anxiety Disorder And TMJ Disorder

12.     Plaintiff suffers from generalized anxiety disorder. Plaintiff also suffers from TMJ (Temporomandibular joint) Disorder, a condition affecting the jaw joints that can cause headaches and facial pain.

13.     When Plaintiff commenced her employment at Defendant Offit Kurman, her generalized anxiety disorder and TMJ disorder were well under control.

### Defendant Offit Kurman Hires Plaintiff

14.     In or around September 2016, Plaintiff was hired at Defendant Offit Kurman in the Virginia Office as a Regional Manager.

15.     As a Regional Manager, Plaintiff was responsible for the financial performance of the Virginia Office. Her job was to provide the attorneys at the office with the support they needed, maximize their revenue potential, and make sure they were following the firmwide strategy determined by Defendant Offit Kurman.

16.     When she joined, Plaintiff was responsible for around 30 attorneys and 10-15 other staff members.

17.     Plaintiff began with an annual salary of $130,000.

18.     Plaintiff's Supervisor, who supervised all the Regional Managers, was Defendant Bukowitz, the then Chief Operating Officer.

19.     Shortly after her hire, Plaintiff informed Defendant Bukowitz that she suffers from generalized anxiety disorder and occasional panic attacks.

**Defendant Bukowitz And Other Supervisors Help The Male Regional Managers Deal With Problematic Employees**

20.     After Plaintiff's hire, there were five total Regional Managers and Plaintiff was the only woman.

21.     On information and belief, all other Regional Managers, who were men, were compensated at a higher rate than Plaintiff.

22.     The male Regional Managers also provided the attorneys at the office with the support they needed, maximized their revenue potential, and made sure they were following the firmwide strategy determined by Defendant Offit Kurman.

23.     All Regional Managers had the same job description and performed the same duties.

24.     Plaintiff noticed quickly upon her hire that the male Regional Managers often had to manage difficult and problematic attorneys who did not want to be managed.

25.     When the male Regional Managers complained about problematic attorneys, Defendant Bukowitz and other higherups allowed for changes in management structure, and even removed problematic attorneys from the Regional Managers in order to make the work of the male Regional Managers easier.

26.     In one example, quickly after joining, Plaintiff heard from Defendant Bukowitz that he implemented an alternate management structure for Regional Manager Joe Crossney ("Regional Manager Crossney") because he was having problems with one of his attorneys.

27.     While Plaintiff was concerned to see that Regional Managers were met with such resistance from the attorneys they managed, she hoped that Defendant Bukowitz would provide her with the same support he did to the male regional managers in handling them.

**Plaintiff Quickly Learns That Defendant Offit Kurman Is A Sexist, Male-Dominated Work Environment**

28.     After her hire, Plaintiff regularly discussed the work environment with her female colleagues and was horrified to find that women regularly faced inappropriate, sexist treatment at Defendant Offit Kurman, and the male discriminators and harassers faced no consequences.

29.     Female attorneys, paralegals, and support staff constantly complained to Plaintiff about the male attorneys' hostile, condescending behavior.

30.     Plaintiff repeatedly told Human Resources ("HR") about the complaints she was hearing, and HR did nothing in response.

31.     In the absence of any help from HR, Plaintiff regularly had to intervene to attempt to stop the sexist mistreatment.

32.     In one example, in or around 2017, Attorney 1 complained to Plaintiff on multiple occasions about Attorney Tom Repcyznski ("Attorney Repcyznski"). Attorney 1 stated that Attorney Repcyznski made inappropriate comments about her physical appearance and was constantly nitpicking her work and yelling at her, but not male employees.

33.     Plaintiff encouraged Associate Attorney 1 to take her complaint to HR. Attorney 1 later complained to HR about the inappropriate, sexist treatment and, upon information and belief, Defendant Offit Kurman took no action against Attorney Repcyznski. Instead, Defendant Offit Kurman simply moved Attorney Repcyznski's work to other support attorneys, and even allowed him to hire a new law clerk.

34.     In another example, in or around 2017, one of the attorneys Plaintiff managed, Steve Stone ("Attorney Stone") was hostile and inappropriate to both Plaintiff and the female support staff.

35.     Plaintiff regularly received chat messages from women who worked on Attorney Stone's side of the office telling her Attorney Stone was screaming at them and asking her to come over to attempt to act as an intermediary and to calm him down. Attorney Stone had regular meltdowns at female attorneys and support staff over extremely minor complaints such as them not answering the phone right or not printing something properly.

36.     On one specific occasion, Plaintiff overheard Attorney Stone tell a female employee that the shoes she was wearing made her legs look good in her skirt. Plaintiff was upset but not surprised, because Attorney Stone regularly commented on women's attractive clothing, but never on men's clothing.

37.     Attorney Stone did not treat male attorneys or support staff in this manner.

38.     When Plaintiff came over and attempted to address the inappropriate behavior, Attorney Stone directed his ire at Plaintiff and refused to calm down.

39.     In or around mid-2017, Plaintiff told Defendant Bukowitz that Attorney Stone was incredibly hostile with her and other women in the office and repeatedly made sexual comments. Plaintiff specifically noted that Attorney Stone only treated female employees this way. Plaintiff reported that Attorney Stone's inappropriate behavior made her job incredibly difficult and that she even had trouble sleeping because of the stress.

40.     Attorney Stone supervised a male associate attorney and, on information and belief, Attorney Stone did not make sexual comments to or act in a hostile manner towards the associate attorney.

41.     Despite offering Plaintiff sympathy, Defendant Bukowitz told Plaintiff there was nothing he could do.

42.     In one instance in or around 2017, Plaintiff was told that Attorney Stone has been searching around a female administrator's desk and in her trashcan. When she asked him what he was doing, he said he was looking for evidence to prove that she had done something wrong.

43.     Plaintiff told him that he cannot do that, and if there was a performance issue, he needed to bring it up with her and not search through an employee's trash.

44.     Attorney Stone simply repeated "OK," while his tone and body language made it clear that he did not like being told what to do by a woman. It was clear to Plaintiff that the female administrator had done nothing wrong, and Attorney Stone was clearly trying to fabricate a reason to denigrate her performance.

45.     After her conversation with Attorney Stone, Plaintiff told Defendant Bukowitz about the conversation, to which he responded that Plaintiff did what she should have done and that he "trust[ed]" her.

46.     After her conversation with Defendant Bukowitz, Attorney Stone went to Defendant Bukowitz, baselessly threatening that he was going to report Plaintiff to HR.

47.     After his conversation with Attorney Stone, Defendant Bukowitz told Plaintiff that Attorney Stone had threatened to go to HR and that he talked Attorney Stone out of reporting her and indicated that Plaintiff should be "grateful."

48.     On information and belief, Defendant Bukowitz did not reprimand Attorney Stone for his baseless threat against Plaintiff or report any of his behavior to HR.

49.     Upon information and belief, had Plaintiff been a male Regional Manager dealing with a difficult attorney, Defendant Bukowitz would have transferred the attorney or offered a new management structure. However, upon information and belief, because Plaintiff is a woman, and

because the problem with Attorney Stone's behavior was sexist, degrading treatment towards women, Defendant Offit Kurman did nothing serious to help the situation.

50.      During this time, Plaintiff told Defendant Bukowitz that she suffered from an anxiety disorder, and that Attorney Stone caused her symptoms to worsen.

### Defendant Offit Kurman Instructs Plaintiff to "Counsel" The Male Attorney About Whom She Complained So He Can Be Rewarded

51.      Later, in or around 2017, Defendant Bukowitz told Plaintiff that Defendant Offit Kurman was supporting Attorney Stone in joining the firm's shareholder group, which brought higher compensation and prestige, but at this time, the shareholder group did not vote him in because his abusive behavior made him a poor candidate.

52.      Defendant Bukowitz instructed Plaintiff to "counsel and guide" Attorney Stone on his behavior so he could be voted into the shareholder group, despite her earlier complaint against him.

53.      While frustrated Defendant Bukowitz knew of Attorney Stone's discriminatory and hostile behavior yet was attempting to award him, Plaintiff did as she was told and continued trying to correct Attorney Stone's behavior.

54.      Later that year, Attorney Stone was voted into the shareholder group.

55.      Upon information and belief, Defendant Offit Kurman did not care about stopping sexism and discrimination and only wanted Plaintiff to "guide" Attorney Stone so they could reward him.

### Defendant Offit Kurman Accidentally Distributes Salary Data Revealing Significant Gender-Based Unequal Pay

56.      In or around 2017, the Chief Human Resources Officer Steve Hyatt ("CHRO Hyatt") accidentally distributed via email a document containing salary data for administrative managers.

57.     Plaintiff was shocked and outraged to find that she was making significantly less than her male Regional Manager counterparts in the same position, doing the same work under the same conditions, by approximately $20,000 annually.

58.     Plaintiff feared complaining due to the sexist, male-dominated work environment she was in.

### The Sexist, White Male-Dominated Work Environment Continues Unabated

59.     In or around late 2017, Plaintiff began working with a newly hired attorney, Steve Hessler ("Attorney Hessler"), who was extremely abusive to work with.

60.     New to the firm, Attorney Hessler refused to adjust to the firm's specific practices and management structure. Attorney Hessler regularly took out his frustration with adjusting to the firm on his female colleagues, and in particular, on Plaintiff, who was in charge of managing him and making sure he adhered to the firm's guidelines and policies.

61.     Attorney Hessler clearly did not want to be managed by a woman. He raised his voice and even stomped his feet at Plaintiff when she tried to give him guidance on Defendant Offit Kurman's policies. Attorney Hessler did not act the same way with his male superiors.

62.     In addition, and similar to her experience with Attorney Stone, Plaintiff regularly received chat messages from female attorneys and administrators that Attorney Hessler was yelling at them and requesting that she needed to speak to him and calm him down.

63.     On multiple occasions he even stomped his feet and threw things in anger during these meltdowns.

64.     Attorney Hessler also regularly sent emails with writing in all caps and openly questioned Plaintiff's competence and ability to do her job.

65.     Management Committee member John Raftery ("Manager Raftery") regularly witnessed Attorney Hessler's sexist, abusive behavior and did nothing to put a stop to it.

66.     Upon information and belief had Plaintiff been a man, she would not have been treated so poorly, as she did not see him behave this way with any male employees.

67.     On one occasion in or around late-2017, one of Attorney Hessler's administrators, Employee 1, who is a Black woman, reported to Plaintiff that Attorney Hessler told her he bought her a gift, which was a box of dark chocolates, and when she asked what the gift was, he told her, "It's what you are."

68.     Plaintiff was horrified to hear of this extremely inappropriate, racist incident. Plaintiff immediately told Employee 1 to report the incident to HR, which she did.

69.     Employee 1 was fired approximately one month later, upon information and belief, because she reported Attorney Hessler for his racist behavior. Upon further information and belief, Attorney Hessler faced no consequences for his behavior, which was condoned by Defendant Offit Kurman.

70.     Plaintiff was incredibly disillusioned and upset from having to deal with Attorney Hessler but feared reporting him to HR after seeing the retaliation Employee 1 faced and also after seeing a previous sexist male attorney she reported, Attorney Stone, facing no consequences.

**Plaintiff Relocates To Help Defendant Offit Kurman Open Their NYC Office**

71.     In or around 2017, Plaintiff realized that Defendant was perfectly happy condoning and encouraging a sexist, hostile work environment in Virginia Office and would not change, despite hers and multiple other female employees' repeated complaints. When Plaintiff learned there would be availability for a Regional Manager at the New York City Office, she jumped at the chance for the new position, hoping the New York City office would not be so blatantly sexist.

72.     In or around 2017, Plaintiff spoke to Manager Raftery, Management Committee member Tim Lynch ("Manager Lynch") and Defendant Bukowitz about her desire to relocate to New York.

73.     Later in or around 2017, CHRO Hyatt reported to Plaintiff that CEO Ted Offit ("CEO Offit") had heard Plaintiff wanted to join the New York Office and said he wanted "only [Plaintiff]" for this opportunity. CHRO Hyatt relayed to Plaintiff that CEO Offit commended Plaintiff's performance thus far and said he thought she would be great for helping Defendant Offit Kurman open the New York Office.

74.     In or around February 2018, Plaintiff relocated to the New York City Office.

75.     Plaintiff received a $30,000 annual salary increase along with the new position. Plaintiff also received a $20,000 performance bonus for excellent performance.

76.     Despite the serious, unaddressed discrimination and hostile work environment in the Virginia Office, Plaintiff hoped things would be different at the New York City Office, and that she would be able to continue advancing at Defendant Offit Kurman.

**Defendants Continues To Create A Hostile Work Environment For Women In NYC**

77.     Unfortunately, the same sexist, male-dominated company cultured existed in the New York City Office and was just as condoned by Defendant Offit Kurman HR and upper management.

78.     In or around Spring 2018, Attorney 2, who is female, was terminated due to alleged performance issues. Strangely, Attorney 2 did not receive any warning about these issues, as was typically done before firing someone.

79.     Approximately one year prior to Defendants terminating her employment, Attorney 2 had taken pregnancy leave and upon her return, expressed that she wanted to have another child.

80.     A few days before Defendants terminated Attorney 2's employment, they asked Plaintiff to find out if Attorney 2 was pregnant, because they knew she wanted to have more children.

81.     On information and belief, Defendants wanted to terminate Attorney 2's employment before she had a chance to become pregnant again and need leave.

82.     Plaintiff did not think she should inquire about Attorney 2 being pregnant or not, but because she knew that Defendant ignored discrimination complaints and retaliated against those who complained, was scared that if she did not find out of Attorney 2 was pregnant, her job was at risk.

83.     Once Plaintiff, begrudgingly, confirmed for Defendants that Attorney 2 was not pregnant, Defendants only then terminated Attorney 2's employment.

84.     Upon information and belief, Attorney 2 filed a EEOC charge against Defendant Offit Kurman alleging pregnancy discrimination and the case settled.

85.     Attorney 2's case was widely discussed at the firm. On one occasion, while Defendant Offit Kurman management was discussing the case, Management Committee member John Raftery ("Manager Raftery") stated that complaining about discrimination was "frowned upon" by employers and should not be done. He added that word would get out that the person had complained and potential future employers would not want to hire a "complainer."

**<u>Defendant Again Ignores A Complaint Of Discrimination</u>**

86.     In or around 2018, Employee 2, who is a person of color, reported to Plaintiff that Attorney Alex Mirkin ("Attorney Mirkin") made a racist comment to her. Plaintiff was horrified and told Employee 2 to report the incident to HR.

87.     Employee 2 did report the incident to HR by reporting to CHRO Hyatt.

88.     After doing an investigation, CHRO told Plaintiff that he believed that the discriminatory action took place, but because he could not prove it, Defendant Offit Kurman would not let him reprimand Attorney Mirkin in any way.

89.     CHRO Hyatt regularly told Charing Party that he thought discriminatory acts were occurring within Defendant Offit Kurman, but Defendant Offit Kurman did not allow him to conduct a substantive investigation, and if he did find discrimination had occurred within his shallow investigation, Defendant Offit Kurman would not let him reprimand the offending employee.

90.     On information and belief, Defendant did not want HR to actually investigate claims of discrimination. As usual, Defendant Offit Kurman took no action against Attorney Mirkin and instead just assigned him to a new administrator.

**Plaintiff Excels In Her Role And Earns A Promotion**

91.     Despite the sexist, hostile work environment, Plaintiff worked hard in her role to the continued praise of her managers. Defendant Bukowitz praised Plaintiff's implementation of Defendant Offit Kurman's strategy in her region and praised her for the region's financial success.

92.     In or around 2018, Plaintiff was promoted to Regional Director.

93.     Plaintiff was told by member of the management committee, Manager Lynch, that the "promotion" was a mere change in title to reflect the work that she already did and to reflect her "stature" at the firm.

94.     Around the same time, all of the other Regional Managers also received the same change in title.

**Plaintiff Complains About A Sexist Attorney, To No Avail**

95.     At a management meeting between attorneys and regional directors, Attorney Zach Glazer ("Attorney Glazer"), who was the practice group leader of the Labor and Employment Department, made a series of sexist, sexual, and inappropriate comments.

96.     In the beginning part of the meeting, Attorney Glazer used various inappropriate, sexist, sexual innuendos while speaking, which made Plaintiff incredibly uncomfortable.

97.     Plaintiff was shocked not only to hear the comments, but to know they came from a labor and employment attorney, who had to have known that commentary did not belong in the workplace.

98.     In the latter part of the meeting, the attorneys and regional directors broke out into small groups to discuss various firm initiatives.

99.     When Plaintiff began speaking about the need for diversity and inclusion initiatives, Attorney Glazer became visibly annoyed and frustrated. When Plaintiff brought up ideas to make the firm more inclusive to LGBTQ individuals because, at the time, Defendant Offit Kurman had few, if any, employees who identified as LGBTQ, Attorney Glazer, out of nowhere, vocally opposed her in front of the rest of the group, including Manager Lynch. Attorney Glazer commented that it was more important that the person be a competent attorney, implying that people who identified as LGBTQ were not as competent as those who did not.

100.    Again, Plaintiff was shocked that a labor and employment attorney could hold such prejudiced attitudes and express them so openly in the workplace knowing his comments violated multiple anti-discrimination laws and created a hostile work environment.

101.    After the meeting, Plaintiff complained to CHRO Hyatt about the discriminatory comments and Attorney Glazer's harsh opposition to diversity and inclusion initiatives. CHRO Hyatt was appalled but knew he would not be able to do anything about the open discrimination.

102.    Plaintiff later heard from CHRO Hyatt that Attorney 3 also had reported Attorney Glazer to HR for his prejudiced attitudes and discriminatory comments at the meeting.

103.    Upon information and belief, Defendant Offit Kurman's HR either did nothing or was prevented from addressing such behavior by the management committee.

**Defendant Refuses To Intervene When Sexist Attorneys
<u>Refuse To Work With Plaintiff</u>**

104.     Throughout 2018, as Plaintiff settled into the New York City office, she found that the attorneys, almost all male, whom she was supposed to manage were incredibly resistant to her efforts to do her job.

105.     Around this time, many male attorneys were assimilated into Defendant Offit Kurman after their law firms were acquired by Defendant Offit Kurman.

106.     Plaintiff was responsible for getting these new attorneys into alignment with Defendant Offit Kurman's policies.

107.     It quickly became clear to Plaintiff that these attorneys were not accustomed to being managed by a woman, and they were incredibly resistant to taking direction from her, even when her instruction was squarely within her role, because of her gender.

108.     The male attorneys refused to listen to Plaintiff when she gave direction on basic, firmwide policies such as how to do billing and the assignment of administrators. The male attorneys acted like Plaintiff could not possibly understand their work and how to manage them.

109.     Plaintiff did not see male attorneys act so resistant to the male regional managers and directors.

110.     One attorney who was new to the firm, Dick Menaker ("Attorney Menaker") regularly refused to take Plaintiff's direction on firm policies and procedures. When Plaintiff did her job by guiding and managing him, he threw temper tantrums and told Plaintiff that Defendant Offit Kurman should change its policies.

111.     To make matters worse, Plaintiff later heard from other attorneys that Attorney Menaker was complaining about her behind her back, saying she did not know what she was doing and did not belong in her position.

112.    Plaintiff also had to constantly deal with complaints from women about Attorney Mike Conway ("Attorney Conway") who frequently yelled at both Plaintiff and his female subordinates and refused Plaintiff's attempts to diffuse his aggressive actions.

113.    Plaintiff did not see male attorneys act so resistant to the male regional managers and directors. Upon information and belief, the male attorneys did not like taking direction from a woman.

114.    Plaintiff constantly complained that the male attorneys were sexist to the management committee, including to Defendant Bukowitz, Manager Lynch, Manager Raftery, and Defendant Skinner.

115.    In response, Plaintiff's superiors told her there was nothing they could do and told her multiple times to just "let it roll."

116.    Multiple times after Plaintiff complained, management would agree that discrimination was occurring, but that Defendant was not going to address it or attempt to remedy the situation.

117.    Plaintiff became increasingly frustrated by this because she knew her supervisors had helped male regional managers and directors when they had difficult supervisees. However, upon information and belief, they would not help Plaintiff because she was a woman complaining about sexism from her reports.

118.    The constant resistance from the attorneys she had to manage caused a great deal of stress for Plaintiff and made her work much more difficult.

119.    Plaintiff repeatedly, through the end of her employment, complained to Defendant Bukowitz that her male attorneys did not like to take direction from a female employee and that if she were a man, they would not ignore her and treat her the way that they did.

**Plaintiff Begins Experiencing Worsening TMJ Disorder And Anxiety Due To
Increased Stress**

120.    In or around late 2018, Plaintiff began experiencing persistent headaches. These headaches became debilitating and hurt Plaintiff's ability to perform normal daily functions.

121.    Plaintiff, who suffered from TMJ disorder, suspected it was related and went to see a doctor, who confirmed as such.

122.    Plaintiff's doctor told her the worsening of her TMJ disorder was caused by increased stress and anxiety.

123.    Plaintiff also openly discussed her symptoms while at work, including in front of her supervisors.

**The Only Other Female Regional Director Also Faces Problems Due To The Sexist, Male-
Dominated Work Environment**

124.    In or around August 2018, Employee 3 was hired as Regional Director and became the only other female regional director besides Plaintiff.

125.    Employee 3 did not last long in the sexist-male dominated work environment, and she was constructively terminated in or around mid-2019.

126.    Upon information and belief, Defendant Offit Kurman management members Defendant Bukowitz and Defendant Skinner singled out Employee 3 because of her gender and made her job more difficult, which pushed her to leave the company.

127.    Employee 3 regularly pushed back against Defendant Bukowitz and Defendant Skinner in order to better support the attorneys under her purview.

128.    Even though male Regional Director's regularly pushed back against Defendant Bukowitz and other managers, Defendant Bukowitz and Defendant Skinner were upset that Employee 3 was doing the same thing.

129.     On information and belief, Defendant Bukowitz and Defendant Skinner did not like that a female employee was engaging in the same actions as male employees, such as pushing back against her supervisors to better do her job, and wanted to force Employee 3 to leave by treating her poorly and much worse than they treated male Regional Directors.

130.     Upon information and belief, Defendant Bukowitz held female Regional Directors to a different standard than male ones, which led to Employee 3's constructive termination.

**Attorney Rod Biermann Sexually Harasses Plaintiff And The Other Female Employees Without Consequence**

131.     In or around 2019, Plaintiff began hearing complaints from multiple female employees that Attorney Rod Biermann ("Attorney Biermann") was constantly winking at them in a suggestive, sexual manner in the office.

132.     On several occasions in or around 2019, Attorney Biermann winked suggestively at Plaintiff and other female employees around the office.

133.     Plaintiff never saw him wink at any male employees.

134.     Plaintiff felt disgusted and extremely uncomfortable, but also completely powerless as she knew whenever she or other female employees complained to HR nothing would be done.

135.     Shockingly, Attorney Biermann was a labor and employment attorney, who had to have known this type of workplace sexual harassment was unlawful. Upon information and belief, Attorney Biermann knew he could get away with the unlawful sexual harassment because he knew Defendant Offit Kurman cultivated a culture of discrimination and sexual harassment.

136.     Eventually, after several women complained about him to HR, HR claimed they would "talk to him" about the harassment. Still, upon information and belief, Attorney Biermann faced no real consequences for the harassment.

137.     After this "talk," Attorney Biermann  continued to wink at female employees.

**Tells Plaintiff Male Attorneys Find Her "Unhelpful"**

138.    In or around Mid 2019, Defendant Bukowitz called Plaintiff into a meeting with Manager Raftery.

139.    Defendant Bukowitz reported that several of the attorneys Plaintiff managed said they found her "unhelpful."

140.    Defendant Bukowitz knew that Plaintiff had made repeated complaints about the sexist environment and the failure of many of the male attorneys she worked with to take any form of direction from her.

141.    As Defendant Bukowitz and Manager Raftery began providing examples cited by the attorneys, Plaintiff realized these examples were all either fabricated or extremely exaggerated.

142.    Defendant Bukowitz gave various examples of attorneys complaining that Plaintiff did not handle maintenance requests quickly enough, even though it was not her job to handle maintenance requests and she could not control how quickly submitted maintenance requests were fulfilled.

143.    Defendant Bukowitz also stated that Attorney Conway complained about her saying she did not provide him enough support when he was first hired, even though Defendant did not give Plaintiff enough back-office support to handle his hire, which was done with extremely short notice.

144.    Upon information and belief, Attorney Conway was told by Defendant that because he was starting on such short notice, Defendant did not have enough back-office support at the time of his hire and his onboarding would take longer than usual.

145.    Upon information and belief, the male attorneys did not like taking orders from a woman, so they made baseless complaints about her in an attempt to get her demoted or fired.

146.     Upon further information and belief, had Plaintiff been a man or had she not have repeatedly complained about discrimination, Defendant Bukowitz would have defended her from such baseless, insignificant criticisms, instead of using them against her.

147.     Upon information and belief, Defendant Bukowitz held Plaintiff to a different standard because she is a woman.

148.     Plaintiff provided proof to show that all the complaints were illegitimate, and Defendant Bukowitz admitted that there was no need for further action.

149.     Despite acknowledging that Plaintiff should not be reprimanded based on the complaints against her, Defendant Bukowitz still asked Plaintiff if she was "willing" to work to improve the relationship, effectively putting the onus on Plaintiff to overcome the male attorneys' discrimination.

**Attorney Biermann Continues Harassing Female Employees**

150.     Later in or around 2019, Plaintiff was disgusted, but sadly not surprised, to hear that Attorney Biermann had continued harassing female employees in the office, after already being reported to HR by several female employees for winking at them earlier that year.

151.     This time, a paralegal, Employee 4, reported Attorney Biermann for physically intimidating her in the office.

152.     It was widely discussed and observed around the office Attorney Biermann's outrage at being reported to HR.

153.     HR assured Employee 4 that someone would "talk to" Attorney Biermann, and upon information and belief he was made to sign a letter acknowledging that someone "talked to" him about the harassment. Upon information and belief, he faced no other consequences.

154.     Attorney Biermann has since been elevated into Defendant Offit Kurman's shareholder group, which is a prestigious group in which to belong, and also comes with an increase in compensation.

155.     Defendants not only fail to adequately address discrimination, but they elevate those who discriminate.

156.     Around this time, in private, Manager Raftery commented to Plaintiff that he did "not believe" Employee 4. Plaintiff held back her disgust and did not reply.

**CEO Ted Offit Physically Intimidates Plaintiff For Expressing An
Opinion Contrary To His**

157.     In or around late 2019, Defendant Offit Kurman's NYC Office was planning a move to a new location and still looking for the proper spot. In a meeting with management, management proposed a new location that would be highly inaccessible via the subway. Plaintiff pointed this out and said a different location should be selected, which management said they would consider.

158.     Some time after this meeting, Plaintiff was working with a marketing manager in a conference room on an unrelated matter.

159.     During the meeting, CEO Offit came in and confronted Plaintiff, saying he heard she did not like the new office location.

160.     Plaintiff explained her concerns with the new office location, saying it was so inconvenient and inaccessible that people might leave the firm.

161.     CEO Offit nodded and left the room.

162.     Later that day, CEO Offit came to Plaintiff's office to reprimand her for the opinion she shared in front of the marketing manager, which he apparently found incredibly inappropriate.

163.    CEO Offit was visibly enraged and approached Plaintiff, who was sitting in her chair. Plaintiff was shocked at his complete change in tone.

164.    He began to stand directly over Plaintiff in a way that limited her physical movements, clearly doing so in order to physically intimidate and scare her. CEO Offit berated Plaintiff, saying he "[doesn't] care if support staff leave" and that she should never dare contradict his opinion in front of a subordinate. CEO Offit continued that "we don't make decisions based on support staff." At the time, the vast majority of support staff were women.

165.    Plaintiff was shocked and disgusted that she had to face such abuse from a partner at the firm.

166.    Plaintiff knew if she did anything other than agree with CEO Offit, his aggressive behavior would escalate, so she calmly agreed and apologized.

167.    Plaintiff did not report this incident to HR out of fear of retaliation, but discussed it with her female colleagues, who were horrified.

**Plaintiff Delivers A Presentation To Her Superiors To High Praise**

168.    In or around February 2020, Plaintiff gave a presentation to various higherups at Defendant Offit Kurman, including Manager Lynch, Manager Raftery, Defendant Bukowitz, and Defendant Skinner. In her presentation Plaintiff outlined a restructure to the marketing and business development departments, including creating the position of Chief Marketing Officer.

169.    After her presentation, Plaintiff's superiors praised her valuable work.

170.    Defendant Bukowitz told her that she could "end up leading the marketing team."

**Plaintiff Reports Another Male Attorney To HR, Again, To No Avail**

171.    In or around early 2020, Plaintiff received several complaints from women in the office that Attorney Dan Goldberg ("Attorney Goldberg") was extremely short-tempered and that

he would yell and scream at administrators and IT personnel over very minor issues or issues caused by Attorney Goldberg himself.

172.    On multiple occasions he also yelled at Plaintiff and Employee 5.

173.    On one occasion in or around, early 2020, Plaintiff reported Attorney Goldberg to HR for his mistreatment of the female staff. Employee 5 also reported him in or around 2020.

174.    Plaintiff was told that HR would look into it, but Attorney Goldberg's behavior continued and, upon information and belief, no action was taken against him.

### Defendants Terminate CHRO Hyatt's Employment

175.    In early 2020 Defendants attempted to force CHRO Hyatt to retire because of his repeated—yet unsuccessful—attempts to prevent the discriminatory and hostile work environment from continuing.

176.    CHRO Hyatt agreed to retire in August 2020, however before he had a chance to, when Covid-19 hit, Defendants underwent layoffs, and instead of forcing CHRO Hyatt into retirement, they terminated CHRO Hyatt's employment under the guise of a company-wide layoff.

177.    Upon information and belief, he was fired for being vocal about the rampant discrimination and harassment at the firm.

### Defendant Offit Kurman's New HR Business Partner Tells Plaintiff To Stop Complaining Of Discrimination

178.    In or around Spring 2020, Defendant Offit Kurman hired Allison Yanar as Human Resources Business Partner ("HRBP Yanar").

179.    Upon information and belief, HRBP Yanar was instructed by Defendant Offit Kurman upper management to quell complaints of discrimination and to not attempt to make any changes regarding the discriminatory environment.

180.    In or around Spring 2020, HRBP Yanar came to the office and told Plaintiff in private that she had heard Plaintiff had problems with some of the male attorneys. She informed Plaintiff that instead of raising issues about discrimination to HR and her managers, she should just "let it roll."

181.    Plaintiff recognized that HRBP Yanar used the exact same language as she had seen Defendant Bukowitz and Manager Raftery use in the past and realized that they must have given the new HRBP the same directive to "let it roll," ignore illegal discrimination and hostile work environment.

182.    Upon information and belief, it was Defendant Offit Kurman's firm policy to "let it roll" with regards to the widely known and complained about sexist, hostile work environment for women, and HRBP Yanar was forced to implement this policy.

183.    Upon information and belief, HRBP Yanar was warning Plaintiff that she should not continue complaining about the sexist male attorneys or raising any issues of discrimination and harassment if she wanted to keep her job.

### Plaintiff Continues To Excel In Her Role

184.    Despite the sexist, male dominated hostile work environment, Plaintiff continued to work incredibly hard and excel in her role.

185.    In Spring 2020, Plaintiff received another positive performance review from Defendant Bukowitz.

186.    Defendant Bukowitz, Manager Raftery, Tim Lynch, and Rob Skinner regularly praised Plaintiff for her knowledge of the firm's policy and procedures and noted that Plaintiff excelled above her peers in this and many other aspects of the Regional Director position.

187.    Despite this praise, on information and belief, Plaintiff was still being paid less than her male counterparts at this time, and through the end of her employment.

188.    Members of the management team continually asked Plaintiff to sit in on Defendant Offit Kurman's special workgroups that required a Regional Director.

189.    While the other, all male, Regional Directors either sat on either one or no special workgroups, Plaintiff sat on several at a time, and at one point was on nine special workgroups at once. These included workgroups pertaining to the remote workforce, employee engagement, administrative restructuring, the women's leadership group, and the diversity and inclusion workgroup.

190.    In or around Summer 2020, Defendant Offit Kurman hired an external consultant to advise Defendant Offit Kurman on its marketing structure. Plaintiff spoke with the consultant and shared with him her presentation that she gave in February 2020.

191.    The consultant later called Plaintiff and told her that his final recommendation to the firm was nearly identical to what Plaintiff had outlined in her presentation.

192.    The consultant told Plaintiff that he told Defendant Offit Kurman's management committee that Plaintiff should be promoted to Chief Marketing Officer.

193.    Defendant Offit Kurman ultimately implemented the program which Plaintiff created, and the consultant supported, but did not give Plaintiff any credit and ignored the consultant's suggestion of promoting Plaintiff.

194.    The only change Defendant made to Plaintiff's program was that Defendant created a Director position instead of a Chief Marketing Officer position, which Defendant did not give to Plaintiff.

**Plaintiff And A Female Colleague Are Forced To Pack Up The Male Attorney's Offices Before The Firm Moves**

195.    In or around September 2020, Defendant Offit Kurman's NYC office began the process of physically moving locations.

196.     Plaintiff was shocked to find, as the date of the move approached, the male attorneys refused to pack up their own things or assist in any way with the move.

197.     Plaintiff, becoming increasingly worried, asked Manager Raftery for assistance in getting the attorneys to help with the move, as was their responsibility. Manager Raftery did not give any suggestions or enforce the responsibility on the attorneys, thus making it clear that the burden of this work would fall on her, even though this work was clearly not among her job responsibilities.

198.     All of the work of packing and moving the office was left to Plaintiff and Employee 5.

199.     Plaintiff and Employee 5 were in the office seven days a week, for about four weeks, devoting a significant amount of time to the move. Plaintiff worked significantly more hours than her male peers during this time.

200.     Plaintiff and Employee 5 were forced to do menial tasks and physical labor such as packing boxes, scanning and destroying documents, for four floors of a building that Defendant Offit Kurman occupied.

201.     Plaintiff repeatedly complained to Defendant Bukowitz and Defendant Skinner, who told her that the firm could not send anyone to help and that she would have to do the work.

202.     Upon information and belief, Defendant Offit Kurman left all the work of moving to Plaintiff and Manager Passione because they are women.

203.     In comparison, when the Bethesda office underwent a move earlier that year, Plaintiff's male counterpart had barely even entered the office because Defendant Offit Kurman provided full support for them during the move.

204.     After the move was successfully completed, in large part due to Plaintiff and Employee 5's work, Defendant Bukowitz briefly thanked Plaintiff, barely recognizing the intense, difficult project she was forced to do with very little help.

205.     Later, in or around December 2020, Defendant Offit Kurman also provided significant support to Regional Director John Brunnett while the Maple Lawn office underwent a move, further indicating to Plaintiff that the only reason she was left to physically move the office is because she is a woman.

### Plaintiff And A Female Colleague Are Forced To Act As Secretaries For The Male Attorneys

206.     In or around December 2020, Defendant Offit Kurman experienced a phishing attack. Due to the attack, none of the administrative staff were able to access the firm system.

207.     As a result, Plaintiff and Employee 5 were expected by the male attorneys to act as legal secretaries for around 50 attorneys, completely blocking their ability to do their actual work. None of the other, all male, Regional Directors were asked to perform the same tasks.

208.     This situation lasted for about a month, in which Plaintiff worked late hours on a daily basis, forced to act as a legal secretary on top of her normal job responsibilities. Plaintiff saw that she was working significantly more hours than the male Regional Directors.

209.     Upon information and belief, Plaintiff and Employee 5 were expected to act as secretaries because they are women.

### Defendant Offit Kurman Continues To Terminate Women Due To The White-Male Dominated, Discriminatory Work Environment

210.     Throughout her employment, Plaintiff regularly continued to witness women terminated or pushed to leave the firm at a much higher rate than men.

211.     As she typically witnessed, when female employees spoke out against the white-male dominated, discriminatory work environment, either nothing happened, or they were sharply retaliated against, including by Defendant terminating their employment.

212.     In another example of this, Plaintiff heard that Attorney Repcyznski, in Defendant Offit Kurman's Virginia office had continued to act abusively towards his female colleagues. One attorney, Attorney 4 reported the treatment to upper management on multiple occasions and was told that something would be done.

213.     In or around January 2021, firm management announced that Attorney 4 was resigning. As Plaintiff later found out, Attorney 4 was in fact fired directly after she began complaining about Attorney Repcyznski.

### Plaintiff Gains A New, Highly Problematic And Difficult Attorney As Her Report

214.     In or around January 2021 Attorney Susie Kim ("Attorney Kim") joined Defendant Offit Kurman and began working under Plaintiff.

215.     Immediately upon Attorney Kim's hire, Plaintiff noticed that she was extremely abusive to other staff, including Employee 5, and to Plaintiff herself.

216.     Attorney Kim regularly engaged in passive aggressive commentary towards Plaintiff and even resorted to direct insults of Plaintiff's competence. She regularly sent barrages of hostile emails to Plaintiff, not waiting for her to respond. She even disparaged Plaintiff to her other colleagues.

217.     Plaintiff and Employee 5, who had similar problems with Attorney Kim, regularly complained to firm management, including Defendant Bukowitz, that Attorney Kim was extremely difficult to work with.

218.     Plaintiff and Manager Passione's complaints were ignored.

219.     Upon information and belief, had a male regional director been assigned a difficult

attorney, Defendant Offit Kurman management would have taken steps to support the manager.

220.    Indeed, as Plaintiff realized, Defendant Offit Kurman, was only willing to support its staff when it came to supporting male discriminators and shielding them from consequences for their actions.

### Plaintiff Presents A New Initiative To The Firm, Only To Have Her Work Taken And Unacknowledged

221.    In or around March 2021, Plaintiff was asked to propose a comprehensive attorney leadership initiative to the firm, specifically at the request of CEO Offit.

222.    Plaintiff consulted with her colleagues on the project, and ultimately did about 75% of the work.

223.    After Plaintiff sent her completed proposal to the firm via email, strangely, no one replied.

224.    Still, to Plaintiff's shock, Defendant Offit Kurman implemented the proposal almost exactly as Plaintiff had design it, never giving her any credit for the work.

225.    Plaintiff was upset and demoralized that Defendant Offit Kurman continued to take advantage of her hard work and excellent performance without acknowledging her.

### Attorney Kim Makes Plaintiff's Job Extremely Difficult And Exacerbates Her Anxiety Disorder

226.    As Plaintiff continued to manage Attorney Kim, she became increasingly difficult to work with.

227.    Attorney Kim repeatedly refused to do what Plaintiff said, even when it came to Plaintiff asking her to follow standard COVID-19 protocols in the office.

228.    In or around Spring 2019, after working with Attorney Kim for only one week, a new paralegal at the firm begged her manager to transfer her to another attorney because Attorney Kim was so abusive towards the paralegal.

229.    Attorney Kim continued to be extremely demanding, constantly requesting more resources in terms of paralegal or administrative support, but at the same time alienated all of her colleagues with her extremely hostile behavior.

230.    Attorney Kim's behavior directly exacerbated Plaintiff's anxiety disorder. Plaintiff began experiencing more frequent panic attacks and other problems as a result of managing Attorney Kim.

231.    Plaintiff regularly complained to upper management, including Defendant Bukowitz about Attorney Kim, saying she needed support dealing with her as she was causing problems for various employees, and her complaints were ignored.

232.    Plaintiff also complained to her supervisors that Attorney Kim was making her anxiety symptoms worse and that she needed to not work with Attorney Kim to accommodate her disability.

**Defendant Offit Kurman Promotes A Sexual Harasser**

233.    In or around Spring 2021, Plaintiff heard from her colleague Attorney 5 an appalling instance of sexual harassment and discrimination from Attorney Repcyznski, who women had been complaining about regularly throughout Plaintiff's tenure at Defendant Offit Kurman, to no avail.

234.    Attorney 5 reported that she met with Attorney Repcyznski for feedback on a presentation she was giving and Attorney Repcyznski began ranting about another female attorney Attorney 6.

235.    Attorney Repcyznski told Attorney 5 that he believed Attorney 6 earned professional success by sleeping with clients. Attorney Repcyznski also reportedly told Attorney 5 that she should start exposing her cleavage more at work.

236.    Attorney 5 immediately reported the incident to HR, whose only response was to provide Attorney Repcyznski with a therapist. HR reportedly told Attorney 5 that this was the best solution because the therapist would tell Attorney Repcyznski that his behavior was wrong.

237.    On information and belief, Defendant did not reprimand Attorney Repcyznski at any time in response to any complaint of discrimination made against him.

238.    Shortly thereafter, Attorney 5 resigned.

239.    Later that year, Attorney Repcyznski was promoted to Practice Group Leader, and has remained a member of Defendant Offit Kurman' s shareholder committee.

240.    Plaintiff was appalled to hear that a male attorney who was repeatedly reported for sexual harassment and discriminatory behavior was favored and rewarded at Defendant Offit Kurman, while the women he harassed were either fired or forced to resign.

**Defendant Again Tells Plaintiff To Stop Complaining To HR**

241.    In or around April 2021, Plaintiff had her annual performance review with Defendant Bukowitz.

242.    At this time, Plaintiff received an annual bonus and raise for excellent performance but was still earning less than her male counterparts.

243.    Defendant Bukowitz highly praised Plaintiff's work as well as her knowledge of firm policies and procedures, but strangely told her that her only area of improvement was to "utilize[e] HR resources less."

244.    When Plaintiff asked about using HR less, Defendant Bukowitz said that when he asked HR about the New York office, HR informed him that the department was spending a disproportional amount of time resolving issues within the office.

245.    Plaintiff was not surprised, because the New York office was the only office with a female Regional Director, and the only office where the attorneys were refusing to work with

the assigned Regional Director. Additionally, as the only female Regional Director, Plaintiff was complaining about sexism on behalf of herself and other female employees, and, on information and belief, in the other offices, the female employees complained less because they knew that Defendants tolerated and even rewarded sexual harassment, and so they did not feel like they could complain.

246.     Defendant Bukowitz was making it clear that if Plaintiff wanted to succeed at Defendant Offit Kurman, she had to stop complaining about discrimination to HR.

### Defendant Bukowitz Searches For Issues In Plaintiff's Performance In Retaliation For Her Complaints

247.     After her performance review, Plaintiff continued to complain about sexism within the New York office, as she had repeatedly done, despite Defendant telling her to stop.

248.     On information and belief, during this time, Defendant recognized Plaintiff as a "complainer" and was upset that HR was spending so much time dealing with discrimination issues within the New York office.

249.     During this time, Defendant assigned Regional Manager Crossney to also supervise Employee 5, without involving Plaintiff in the decision.

250.     Defendant did not do this to male Regional Directors.

251.     In or around September 2021, Employee 5 informed Plaintiff that she believed that Regional Manager Crossney was attempting to "spy" on Plaintiff through her.

252.     Plaintiff believed that Defendant was trying to find ways to terminate Plaintiff's employment because once she was gone, the complaints of discrimination would also be gone.

253.     Employee 5 reported that Regional Manager Crossney repeatedly asked about Plaintiff's performance, even when it did not pertain to matters at hand, clearly trying to find problems with her work.

254.    Manager Crossney also reportedly told Employee 5 not to tell Plaintiff that he was asking about her.

255.    Upon information and belief, Regional Manager Crossney was working with Defendant Bukowitz to find issues with Plaintiff's performance in order to set her up for termination for complaining about discrimination.

**Plaintiff Complains About Attorney Kim To Defendant Bukowitz,**
**Citing Her Anxiety**

256.    In or around October 2021, Plaintiff met with Defendant Bukowitz regarding the continued difficulties she had managing Attorney Kim.

257.    Plaintiff explained that Attorney Kim exacerbated her anxiety disorder and caused her to have panic attacks in the office.

258.    Plaintiff requested a reasonable accommodation be made by implementing a different management structure that would separate her from Attorney Kim in order to help with her anxiety. Upon information and belief, Defendant Bukowitz understood Plaintiff to be asking for a reasonable accommodation for her mental health disability.

259.    Plaintiff referenced an alternate managing structure which Defendant had implemented for two other employees, Regional Manager Crossney and Ari Karen ("Attorney Karen"), who were having issues with each other.

260.    Defendant Bukowitz reluctantly agreed to set up a different management structure. The next day, he emailed Plaintiff that he would create a new structure where Legal Operations Director Sherry Jones ("Director Jones") would directly manage Attorney Kim and Plaintiff would work with Director Jones.

**Plaintiff Begins Seeing A Therapist**

261.    The alternate management structure provided Plaintiff only a little relief, as Attorney Kim still sent Plaintiff harassing emails instead of working with her new direct supervisor.

262.    In or around October 2021, Plaintiff began seeing a therapist due to the worsening of her anxiety caused by having to work with Attorney Kim.

263.    Plaintiff saw this therapist regularly through the rest of her employment at Defendant Offit Kurman and used therapy to continue dealing with the stress and anxiety surrounding the discriminatory, male-dominated work environment.

**Defendant Pushes Out Multiple Female Employees**

264.    In or around November 2021, Employee 4 resigned. In her exit interview, she spoke out against the gender disparate treatment she was subjected to and how it went unaddressed.

265.    In her exit interview, Employee 4 also praised Plaintiff as an excellent Regional Director.

266.    On or around November 17, 2021, Employee 5 resigned. In her exit interview, she complained about Attorney Kim, saying HR should investigate her behavior.

267.    Employee 5 also praised Plaintiff as her manager.

268.    Plaintiff became increasingly concerned about her status at Defendant Offit Kurman as her female colleagues continued to be pushed out of the company.

**Plaintiff Reports Attorney Kim To HR**

269.    In or around early December 2021, Attorney Kim's administrator called out sick for two weeks, upon information and belief, because Attorney Kim verbally berated him in the office and he could not handle it anymore.

270.     On or around December 9, 2021, Attorney Kim emailed Plaintiff for support since her administrator was out, even though it was clear someone else had already provided her with the information she was asking for about the support she would be getting.

271.     Plaintiff briefly and professionally replied with the requested information.

272.     Attorney Kim shockingly replied to Plaintiff's response with a long list of unfounded criticisms of Plaintiff. Among these criticisms, Attorney Kim denigrated Plaintiff as someone who is not "warm or proactive."

273.     Plaintiff felt her anxiety increase from the completely uncalled for email. She immediately reported the email to HR as well as to upper management Defendant Bukowitz, Defendant Skinner, Manager Raftery, and Manager Lynch, and said something needed to be done about Attorney Kim's behavior.

274.     Plaintiff reported to HR that it was sexist for Attorney Kim to claim she was not "warm" enough.

275.     Shortly thereafter, Defendant States emailed Plaintiff and said she would start an investigation into Attorney Kim.

276.     Plaintiff responded that it felt like Defendant Offit Kurman was trying to get rid of her, since whenever she reported problematic employees she received no support.

277.     On or around December 27, 2021, Defendant States emailed Plaintiff a letter stating the conclusion of the investigation, that they found no reason to believe Attorney Kim acted inappropriately in the workplace.

278.     On information and belief, when Defendant set up an alternate managing structure for Regional Manager Crossney he had issues with attorneys, Regional Manager Crossney did not have to continue to work with the difficult attorney, as Plaintiff still had to do.

## **Attorney Kim Berates Plaintiff At A Meeting**

279.    On or around December 30, 2021, Attorney Kim, clearly emboldened by HR's refusal to support Plaintiff in her job, berated Plaintiff at a morning meeting in front of 22 other employees.

280.    Attorney Kim claimed she was not given proper notice of her administrator having Covid, even though it was not even Plaintiff's job to give her this notice, and she was given notice within 4 hours, on Christmas Eve, and when the company rule for Covid notifications was within 24 hours.

281.    Attorney Kim continued yelling at Plaintiff and prevented the meeting from moving on. Plaintiff attempted to calm her down and repeatedly asked Attorney Kim if they could discuss the matter in private, but Attorney Kim would not stop.

282.    Plaintiff looked around and saw shocked expressions on her colleagues faces that Attorney Kim would behave so cruelly and unprofessionally towards Plaintiff.

283.    On information and belief, Attorney Kim escalated her poor treatment of Plaintiff in retaliation for Plaintiff's complaint.

284.    After the meeting, Plaintiff left in tears and immediately reported the incident to HR Rep States and Defendant Bukowitz. Plaintiff felt humiliated and feared that Attorney Kim would continue berating her and attempting to do damage to her reputation if HR did not put a stop to her behavior.

285.    After the meeting, as Plaintiff later found out, Attorney 6 also reported Attorney Kim's behavior at the meeting to HR.

286.    Upon information and belief, Attorney 6 later met with HR about her report, but HR still did nothing about it.

### Defendant Terminates Plaintiff's Employment In Retaliation

287.    That same day, on or around December 30, 2021, less than an hour later, Defendant Bukowitz and Defendant Skinner entered Plaintiff's office, who was still visibly distraught from the incident and said, "you must know why we are here."

288.    Plaintiff asked if it was because of the incident with Attorney Kim.

289.    Defendant Bukowitz replied "this isn't directly related to [Attorney Kim], but" and then told Plaintiff she was being terminated.

290.    Defendant Bukowitz cited the reason for Plaintiff's termination as her "being increasingly adversarial to staff and management committee decisions." Upon information and belief, by saying Plaintiff was "increasingly adversarial," Defendant Bukowitz was accusing Plaintiff of behaving inappropriately by regularly reporting sexism to HR.

291.    Plaintiff was baffled by this reason, as she had never been given any prior warning about this problem and only received positive performance evaluations. In fact, the only negative comment in her most recent performance evaluation was that she complained to HR too much.

292.    Defendant Bukowitz did not provide an example, and Defendant Skinner remained silent for the entire meeting.

293.    Upon information and belief, Defendant Offit Kurman used Plaintiff's dispute with Attorney Kim as a pretext for firing her due to her gender and out of retaliation for her complaints of discrimination.

294.    Upon information and belief, had Plaintiff been a man and had she not complained of discrimination, Defendant Offit Kurman would have supported her to succeed at the company instead of firing her.

295.    Through the end of her employment, on information and belief, even after moving to New York, Plaintiff earned less than the male Regional Directors despite performing the same functions.

### AS FOR THE FIRST CAUSE OF ACTION
*(Unequal Pay in Violation of the Equal Pay Act against Defendant Offit Kurman)*

296.    Plaintiff repeats and realleges each and every allegation contained in this Complaint with the same force and effect as if fully set forth herein.

297.    At all times relevant to this action, Plaintiff was employed by Defendant Offit Kurman within the meaning of the Fair Labor Standards Act 29 U.S.C. §§ 201 *et seq.*, as amended to include the Equal Pay Act, 29 U.S.C. §§ 206(d) *et seq.*

298.    At all times relevant to this action, Defendant Offit Kurman was an employer within the meaning of the FLSA and the Equal Pay Act.

299.    The acts, practices and policies of Defendant Offit Kurman, as set forth above, constitute discrimination against Plaintiff, in violation of the FLSA and the Equal Pay Act, by unlawfully paying female employees less than white male, employees for equal work. Upon information and belief, Defendant Offit Kurman was aware of complaints made by Plaintiff concerning Defendant's unfair pay practices, but did not rectify or investigate its unlawful pay practices.

300.    Defendant Offit Kurman's violations of the Equal Pay Act were willful and/or reckless, entitling plaintiff to the three-year statute of limitations and liquidated damages available under the FLSA and the Equal Pay Act.

## AS FOR THE SECOND CAUSE OF ACTION

*(Gender/Sex and Disability Discrimination in Violation of the New York State Human Rights Law against all Defendants)*

301.     Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

302.     Defendants have discriminated against Plaintiff on the basis of her gender/sex and disability, in violation of the New York State Human Rights Law, NYS Executive Law § 296, *et seq*.

303.     Defendants have discriminated against Plaintiff by subjecting her to severe and pervasive sexual harassment, a hostile work environment, and other forms of discrimination on the basis of her gender/sex and disability.

304.     Defendants failed to engage in any form of interactive process when Plaintiff made a request for a reasonable accommodation.

305.     Defendants' conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of Plaintiff, entitling Plaintiff to punitive damages.

306.     By reason of Defendants' discrimination, Plaintiff is entitled to all remedies available for violations of the New York State Human Rights Law as to all Defendants. Plaintiff shall seek attorney's fees and punitive damages.

## AS FOR THE THIRD CAUSE OF ACTION

*(Retaliation in Violation of the New York State Human Rights Law against all Defendants)*

307.     Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

308.     Plaintiff opposed and reported Defendants about Defendants' discriminatory treatment of her.

309.     In retaliation, Defendants subjected Plaintiff to a series of adverse employment

actions including, but not limited to, terminating her employment, in violation of the New York State Human Rights Law.

310.    Defendants' conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of Plaintiff.

311.    As a result of Defendants' conduct alleged in this Complaint, Plaintiff has suffered and continues to suffer harm, including but not limited to lost earnings, lost benefits, other financial loss, and non-economic damages.

312.    By reason of Defendants' retaliation, Plaintiff is entitled to all remedies available for violations of the New York State Human Rights Law as to the Defendants. Plaintiff shall seek attorney's fees and punitive damages.

### AS FOR THE FOURTH CAUSE OF ACTION
*(Aiding and Abetting Discrimination and Retaliation under the NYSHRL*
*against the Individual Defendants)*

313.    Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

314.    New York Executive Law Section 296(6) makes it "an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the facts forbidden under this article, or attempt to do so."

315.    The Individual Defendants aided and abetted the gender and disability discrimination and retaliation against Plaintiff.

316.    Individual Defendants fosters, and throughout Plaintiff's employment fostered, an environment which discriminates against females.

317.    Individual Defendants aided and abetted the gender discrimination by, among other things, subjecting Plaintiff to said discrimination, allowing said discrimination to occur, failing to

investigate said discrimination, creating a hostile work environment, and unlawfully terminating Plaintiff's employment.

318.    As a result of the Individual Defendants' conduct alleged in this Complaint, Plaintiff has suffered and continues to suffer harm, including but not limited to lost earnings, lost benefits, other financial loss, and non-economic damages.

319.    By reason of the Individual Defendants' unlawful conduct, Plaintiff is entitled to all remedies available for violations of the New York State Human Rights Law as to the Individual Defendants. Plaintiff shall seek attorney's fees and punitive damages.

## AS FOR THE FIFTH CAUSE OF ACTION
*(Gender/Sex and Disability Discrimination in Violation of the New York City Human Rights Law against all Defendants)*

320.    Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

321.    Defendants have discriminated against Plaintiff on the basis of her gender/sex and disability, in violation of the New York City Human Rights Law, N.Y.C. Admin. Code § 8-101 *et seq.*

322.    Defendants have discriminated against Plaintiff by subjecting her to severe and pervasive sexual harassment, a hostile work environment, and other forms of discrimination on the basis of her gender/sex and disability.

323.    Defendants failed to engage in any form of interactive process when Plaintiff made a request for a reasonable accommodation.

324.    Defendants' conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of Plaintiff, entitling Plaintiff to punitive damages.

325.     By reason of Defendants' discrimination, Plaintiff is entitled to all remedies available for violations of the New York City Human Rights Law as to all Defendants. Plaintiff shall seek attorney's fees and punitive damages.

## AS FOR THE SIXTH CAUSE OF ACTION
*(Retaliation in Violation of the New York City Human Rights Law against all Defendants)*

326.     Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

327.     Plaintiff opposed and reported Defendants about Defendants' discriminatory treatment of her.

328.     In retaliation, Defendants subjected Plaintiff to a series of adverse employment actions including, but not limited to, terminating her employment, in violation of the New York City Human Rights Law.

329.     Defendants' conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of Plaintiff.

330.     As a result of Defendants' conduct alleged in this Complaint, Plaintiff has suffered and continues to suffer harm, including but not limited to lost earnings, lost benefits, other financial loss, and non-economic damages.

331.     By reason of Defendants' retaliation, Plaintiff is entitled to all remedies available for violations of the New York City Human Rights Law as to the Defendants. Plaintiff shall seek attorney's fees and punitive damages.

## AS FOR THE SEVENTH CAUSE OF ACTION
*(Aiding and Abetting Discrimination and Retaliation under the NYCHRL*
*against the Individual Defendants)*

332.     Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

333.    New York City Administrative Code Section 8-107(6) makes it "an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the facts forbidden under this article, or attempt to do so."

334.    The Individual Defendants aided and abetted the gender discrimination and retaliation against Plaintiff.

335.    Individual Defendants fosters, and throughout Plaintiff's employment fostered, an environment that discriminates against females.

336.    Individual Defendants aided and abetted the gender discrimination by, among other things, subjecting Plaintiff to said discrimination, allowing said discrimination to occur, failing to investigate said discrimination, creating a hostile work environment, and unlawfully terminating Plaintiff's employment.

337.    As a result of the Individual Defendants' conduct alleged in this Complaint, Plaintiff has suffered and continues to suffer harm, including but not limited to lost earnings, lost benefits, other financial loss, and non-economic damages.

338.    By reason of the Individual Defendants' unlawful conduct, Plaintiff is entitled to all remedies available for violations of the New York City Human Rights Law as to the Individual Defendants. Plaintiff shall seek attorney's fees and punitive damages.

### AS AND FOR THE SEVENTH CAUSE OF ACTION
*(Violation of The New York State Equal Pay Act Against All Defendants)*

339.    Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

340.    At all times relevant to this action, plaintiff was employed by Defendants within the meaning of Article 6 of the New York Labor Law §§ 190, *et seq*.

341.     Defendants violated the rights of Plaintiff to be paid the same as male employees performing equal work, in violation of New York Labor Law § 194.

342.     The acts, practices and policies of Defendants, as set forth above, constitute discrimination against plaintiff, in violation of the New York State Equal Pay Act, N.Y. Labor Law § 194, *et seq*.

343.     Defendants' violations of the New York Labor Law §§ 190, *et seq.,* were willful within the meaning of N.Y. Labor Law § 198, entitling plaintiff to liquidated damages.

### DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial in the above matter.

### RELIEF DEMANDED

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment as follows:

A.  Declaring that the Defendants and their employees engaged in unlawful practices in violation of the NYLL and the FLSA; unequal pay under the Equal Pay Act and New York Equal Pay Act; and unlawful discrimination and retaliation in violation of the NYSHRL and the NYCHRL;

B.  Awarding Plaintiff compensatory damages for Plaintiff's lost earnings as a result of the retaliation and an equal amount of liquidated damages for the reduced earnings Plaintiff suffered in wages; compensatory damages for Plaintiff's emotional distress; an award of reinstatement or front pay; and an award of punitive damages for Defendants' violations of the NYLL and the FLSA;

C.  Awarding Plaintiff compensatory damages for Plaintiff's lost earnings as a result of the retaliation and an equal amount of liquidated damages for the reduced earnings Plaintiff suffered in wages; for Defendants' violations of the Equal Pay Act and New York Equal Pay Act;

D.  Awarding Plaintiff damages for all lost wages and benefits; compensatory damages for mental, emotional injury, distress, and injury to their reputation in an amount to be proven; and punitive damages for the unlawful discriminatory practices in violation of the NYSHRL and the NYCHRL;

E.  Awarding Plaintiff pre-judgment and post-judgment interest as provided by law;

F.  Awarding Plaintiff the cost, disbursements and legal fees of this action, interest from the date of the verdict rendered hereon and reasonable attorney's fees;

G.  Such other and further relief as this Court may deem just and proper under the circumstances.

Dated:  New York, New York
      May 13, 2024                     Respectfully submitted,

                                          GODDARD LAW PLLC
                                          Attorneys for Plaintiff

                                          By: */s/ Megan Goddard*

                                            Megan S. Goddard, Esq.
                                            Siobhan Klassen, Esq.
                                            39 Broadway, Suite 1540
                                            New York, NY 10006
                                            Office: (646) 964-1178
                                            Fax: (212) 208-2914
                                            megan@goddardlawnyc.com
                                            siobhan@goddardlawnyc.com